D.P. versus Council Rock Mr. Gehring? Good morning, Your Honor. Good morning. Mr. Gehring, on behalf of the appellants, I would like to reserve a few minutes for rebuttal, if I could. Sure thing. Your Honor, as this case raises a very narrow issue on unique facts, in our view, the Court does not have to decide any issues beyond the narrow facts of this case. The Court does not have to decide larger issues of whether under what circumstances school districts in general must offer an IEP mid-school year to a disabled student attending a private school. Sure. We understand the terrible facts in this case, but as I understand it, the mother of D.P. never notified the school district that she wanted to come back. Is that right? Your Honor, in this case, there was no possibility of D.P. coming back to the school. So no, she did not say... And because they had voluntarily removed, I gather that the school district was not under an obligation to continue to monitor. Is that correct? Your Honor, D.P. was enrolled in a private school. There is nothing in the record saying that he was disenrolled from the public school. Dual enrollment can happen. I'm aware of nothing in the record where D.P. was no longer enrolled in a public school simply because his parents had chosen to put him for a period of time in the CLC. So someone's taken out of a public school and put him in a private school. For as long as that child may be in that private school, the public school is supposed to keep on developing a program for him. Is that what you're saying? Your Honor, that is what the statute says, and that is what the regulations say. Where does it say that? Your Honor, in 20 U.S.C., section 1412A.4, that provides an individualized education program or an individualized family service plan must be developed, reviewed, and revised for each child with a disability. There's no exception for children who are in private schools. Section 20 U.S.C. 1414 D.2.A., and this is a statute that is directly discussed in C.H. v. Henlopen, this Court's case in C.H. v. Henlopen, which we've cited in our brief. How about 1412 10 C.I. and double I? Doesn't that indicate that once a fully inadequate F.A.P.E. has been offered pursuant to a valid I.E.P., the district needn't pay private tuition? Your Honor, doesn't it say that? Your Honor, the statute says that, yes. However, there is a duty under the statutes I just cited, including 20 U.S.C. 1414 D.2.A. that says that a school district, such as the one in this case, shall have an effect for each child with a disability in the agency's jurisdiction an individualized education program. And then there's further duties to continue to have annual I.E.P. updates and to revise that I.E.P. So the fact that Drake was, or D.P. was enrolled in the private school in this case does not relieve the district of their obligation. I mean, that language is categorical. If a child was out of the school, if the problem originated in kindergarten and the child was in private school for 12 years following that, how could the school, the public school, even know enough about the child and his current needs to develop such a program? Your Honor, that is why I keep going back to the unique facts of this case. That is definitely not the case here. No, but suppose it was. If what you're arguing is so, by about the 11th grade, you would have no more idea about that child and his needs than the man in the moon. How could you realistically have such a rule, such an interpretation? We are not arguing here that the district has a duty to monitor children in private schools. How could they develop a program? Because the district, in this case, the child had been out of the district for only several months. There was ongoing dialogue between the school district and the parent. The parent was sending further information to the school. The school was offering to develop IEPs. They have argued in their brief... As part of this ongoing dialogue, did the parents ever say, we want you to continue to develop the IEP and the... That was certainly the understanding, and if I... I thought they hadn't responded. Yeah, I thought they hadn't responded to a number of inquiries other than to say that, look, we've elected to go to the private school route, and that's it. The inquiries were in response to DP's parents sending updated evaluation reports to the district. They wanted to keep the district updated in response. But during the summer, I guess of 2007, the school district had sent a number, you know, we'd like to meet with you, we'd like to discuss this further, and all they got back was, to their many communications, was one response, we've decided to go the private school route. But there were further communications after that, Your Honor, and... From the mother to the school? Yes, sending, and I can... Well, there was a letter from the school district on September 17, 2008, and then November 26, I thought, and then another on March 4, and I thought they hadn't responded to... Yes, Your Honor. Your Honor, these were sent because the mother sent updated information to the district. This is not a situation where the parents said, we want nothing to do with you anymore, the child's in a private school and we're done. There was an ongoing dispute about DP's placement, and in relation to that, the parents kept sending updated information regarding DP to the school. Now, the district offered to have IEP meetings. The parents didn't take them up by that time because they were satisfied with where DP was. But what this certainly shows is that, contrary to what is in the school district's brief, where they say once he was enrolled in a private school, they had no duty to develop, update, have anything to do with an IEP for DP. Well, here we have a letter from September 17, 2008, August 28, 2008, and November 26, 2008, a month before the tragedy happened in this, where the school district was reaching out to the parents and saying, let's have IEP meetings. If they had no obligation to do that, why are they sending those letters? Why are they making those offers? It's completely contrary to what they're arguing before the court right now. No, well, it's possible that they were not under a legal obligation to do so, but they did it anyway. Your Honor, I believe they were under a legal obligation. The statutes I just discussed... Does it make a difference whether a parent has voluntarily decided to place a child in a private school after an IEP and an FAP-ER are provided? Your Honor, the district still has an obligation to have a current IEP in place for every disabled child in the district, whether they're in a private school or not. At the beginning of each school year, right? And if you accept that that's an obligation of the school district, then it's also an obligation to have a current IEP in place. There's no... There was an IEP in place at the beginning of the school year in September. There was, but, Your Honor, it expired... January 21st or thereabouts of 08. Yes, it expired mid-year, and it expired about a month after the tragedies in this case. Now, I want to emphasize, Your Honors, that we are, again, we are not arguing that a school district has a duty to monitor a child in a private placement. Well, it does have the child find obligations, right? Yes, it does. And the supplemental education provisions, it does have those duties, although it didn't appear that either one of those duties are you focusing on with regard to this particular case? No, Your Honor. We are focusing on the district's obligation to have a current appropriate IEP in place for every child with a disability in the district, whether they're in a private school or not. Let me ask a dumb question, then. If they had a IEP on January 22nd, and they're saying, you know, we haven't heard from you, so we're just going to continue what we previously had in place, that would appear to be enough, but as a practical matter, what makes the difference? He was in a... he was still in a private school in January of 08, was he not? Yes, Your Honor. And the reason I think... I mean, I think all the people who testified... I'm sorry, January of... not in January of 08, January of 09. 09, I'm sorry. Yes. And that those who... when did the tragedies take place, in December of 08? Yes. 07, 08, I'm sorry. What difference would it have made had they had an IEP in place come January 22 of 09? Practically, what difference? Practically, they would have had to take into account the tragedies of which they knew. They had knowledge. There was no need to monitor. They knew. But I thought the three psychologists or psychiatrists who testified, or those at the hearing, said that it would have been... he should not have been dislocated from the private surroundings... Absolutely, Your Honor. ...in the month immediately after these tragedies. Absolutely, that is correct. And so what the district needed to do was put together a new... a current IEP to replace their expiring one, and that IEP should have specified, in contrast to the previous IEP that had expired, that placed DP in the district, this new IEP should have specified that the only appropriate placement at this time, given what just occurred, is where he's at, CLC. So their duty was to develop a new IEP with a new appropriate placement. That appropriate placement would have been where he was at that time, CLC. If they had done that, what would that have given him here? What we're arguing... What are you seeking, other than payment for the private, I guess, facility, from what, January to April? January to the end of the school year. To the end of the school year. She filed in April, but it would be to the end of the school year. It would have given the family the right to receive a free appropriate public education in the private school, which is what was appropriate for him. It would have given Drake's mother full information regarding her choices. You know, what's the district proposing? And who paid for the fall of 08 in CLC? The parents. Right. And after these tragedies, did the mother ask for a revised IEP? No, Your Honor. There's nothing in the record indicating that she directly asked. Did she ask, or did she not ask? I don't believe she did, Your Honor. I see. Does that make a difference? Your Honor, in this circumstance, it does not. The duty to re-evaluate, there are two ways you can do a re-evaluation or an IEP. That is, either the district, or the parent asks for a revision, or for a re-evaluation, or the district recognizes that the IEP is inappropriate, and either implements a new IEP. And our question here is, how is the district to recognize that? Because the district had direct knowledge of what had happened to Drake. The district had direct knowledge of his condition, autism, which makes transitions troublesome to begin with. But certainly in this case, when everything was pulled out of his life, of any stability, his parents, his house, his home, there was nothing left to him but this school for stability. It would have been entirely inappropriate to transition him back to the school at that time. Therefore, the school district's expiring IEP, which said Drake needs to be educated in the school, was therefore inappropriate. And they should have realized that, or at the very least, initiated the re-evaluation process. I mean, if the district had knowledge that, for instance, a student at a private school received a traumatic brain injury, I don't think there's any question that they would need to initiate a re-evaluation process to find out how is that affecting his education, how does that affect the proper placement for that student. And I don't think this is any different.  the school district was very well acquainted with his history and his issues. And they had direct knowledge of what had happened to his house and his family. Good. Any other questions? We'll have you back in rebuttal. Thank you, Mr. Garrett. Ms. Dionne? Good morning. Good morning, Your Honors. Grace Dionne on behalf of the Council Rock School District. May it please the Court. The panel has hit on many of the arguments that the district is submitting in response to this appeal. Mr. Garrett, Mr. Gehring says that it was your, under the statute and under the regulations, maybe under case law as well, that you had an obligation after the tragedies occurred to revise the IEP on your own. Is that accurate? That is not, Your Honor. The law does not provide for that. There is nothing in the IDEA that requires when a student has been unilaterally removed from a public school to continue to monitor or to continue to offer FAPE absent a parent notifying the district of a request to do so. So, using an example, Mr. Gehring mentioned if a student happened to be brain injured that it would put a district on notice. Let's pretend that a student as many are removed from middle school to go to, let's say, a parochial school for high school. And let's say that that student suffers a brain injury. This would suggest that the district is under a requirement to then contact that family and offer special education services to that student who is in a parochial school or another private school. That just does not meet or pass muster. What I hear Mr. Gehring say is up until January of 2009 understood that the parents had put the child in a private facility and the district didn't have to pay for that. But, with the universal agreement in beginning of 2009 that because of the tragedies of December of 2008, he needed to be in a private facility. The IEP needed to be amended because it's almost inconceivable anyone would have said that he should have been dislocated  been amended, the funding then would have been picked up by the district. So, the question is what was done by the district once the IEP ran out on January 21st of 2009? Your Honor, to answer that you have to examine what the district knew in January of 2009. The district knew factually that a student's house burned down and that a student's father passed away. The district was completely unaware of the opinions of parents expert in January, February, March up until April 1st when we got the due process complaint which included a section stating that the private evaluator was making the claim that a transition was not possible. And with respect to whether this student had an inability to transition it is not accurate that all of the witnesses agreed on that. Rather, Dr. Holmes, whose credibility was severely undermined by the hearing officer and accepted as well by the district court, he was of the opinion that this student could not transition even 14 months after the hearings had begun in this. If you asked him today, he would probably have the same opinion. Where is the student now? Student is at CLC still. But the other Has an IEP been done by the district then? At some point subsequent to January 21 or subsequent to the filing of the complaint of April 2009? Yes, there has been and let me address why that's done. Why that's done is for damage control. It's to go over and above what the legal obligation is but frankly when you're in the midst of litigation with a parent, you suffer the possibility that if that hearing officer had found in favor of CLC that would then be the pendant placement. And in order to guard against the district being on the hook to pay for CLC for all the years going forward, the district would have to demonstrate that it continued making offers of fape. So that is a little bit of a different situation. It's not legally required. We could not do that and defend on other bases, but it's something that is a good practice and to insulate the district in a way. You develop these IEPs in-house don't you? We do, Your Honor. And that's another point that I did want to raise is Would you have people there in-house who would have the expertise to determine that given the condition of DP and given the fact that there had been a death and a fire given the fact that his world was crumbling around him that he needed a new program? Well, Your Honor. Without an expert telling you that? No, you would be required to have individuals such as your certified school psychologist and other individuals in the district that with autism. But the point that you need to recognize here is that Drake all children are unique and different. And yes, Drake is autistic and has severe communication issues. However, in the range of the autistic spectrum Drake is not a child that based upon past involvement, this district programmed the child the summer of 2007 throughout the school year of 2007, 2008 and even the summer of 2008 and recognized that Drake is a child that some autistic children get upset if the teacher is not the same that day. They can't go from one classroom to another. That's not Drake. Drake did not exhibit that and they would not have reason to believe that he would not, even at that time, had they known. Again, they did not know any of this until April 1st. However, even at that point they opined that he would have been able to transfer back and transition back. The testimony in this matter of Ms. Crawford, who is highly expertised in autistic supports for students. She is a supervisor of special education as well as our school psychologist and the behavior analyst. They all opined that based upon his past, indicative would be how he dealt in the past. They believed that he, even at this time when they learned of this, would not have difficulty transitioning back. Again, though, the district was never afforded the opportunity to examine the issue because parent never made the request for programming. Had they done so, and I would like to just mention, had they done so If there was a miscommunication or a lack of communication who should the burden fall on? The parents or the school district? Well, in this instance, I would say that there wasn't a miscommunication. It was really just a lack of information. It should fall on the parent is the one who has the information that was the root of this. The parent was the one who knew when Dr. Holmes came to her home in February, I mean, there was How does the average parent know about the duties of the school district or the fact that you could be required to continue to develop a program for him? I mean, shouldn't it fall on the experts in the school district? Drake's mother is a special education teacher, so she has full well knowledge. She's also had a child who has been involved in special ed programming. She's also a learning consultant. So she is very, very savvy on these issues. And we do have to examine, and there are times, Your Honor, I agree that when a parent possibly has a language issue, a deficiency or some other cognitive reason why they can't fully participate in this process she was able, and I'm not I'm being, I'm not trying to be unsympathetic in any way to Drake's terrible time. However, she was able to elicit the opinions of Dr. Holmes. She had him coming into the home to observe Drake in the home setting as well as the community setting and she developed and had a report which she then submitted it. When you look in the record, her letters are very lengthy, they're very detailed, and she communicates at a high level. I don't believe that based upon these factors she was in any way crippled or unable to notify the district. There's some dispute as to communications between the mother and the school district in the fall of 2008 and Mr. Gehring says that there was constant communication back and forth and you were being kept advised and what is your response to that? Yes, Your Honor, I have those communications in front of me and again, this is mainly going above and beyond what is required. The district receives the private reports and it's not that they are saying that they want to necessarily revise the IEP or do anything, but if you look at the letter of September 17th, it says, if you are interested in scheduling an IEP to review Drake's IEP, please let us know. Again, the district is solid in what it has offered. Did you get a response back? We did not, Your Honor. There was no reply to the September 17th letter. There was likewise in the record no reply to the November 26th 2008 letter. There was likewise no reply to an email March 4th, 2009 and that is substantiated in the record. Is there anything further, Your Honors? Mr. Gehring. Thank you. Thank you, Your Honor. I apologize if I was a little overbearing. Something you were saying just didn't make sense. I understand the point you're making. Your Honor, I would just like to respond briefly to this point that what they were doing was for damage control. The due process complaint in this case was filed in April 2009. All the communications that are in this record that we have cited are for prior to that time. They weren't doing damage control because they had been sued. They hadn't been sued yet. I would point to court a letter dated August 28th, 2008. I thought what she said was after April. For the following year they did put together an IEP did they not? Your Honor, they offered an IEP to Drake on March 4th, 2009. That was a letter. It's at 287A of the record. That was a letter that was sent prior to the due process complaint being filed in this saying let's have an IEP meeting. So the only time there isn't an IEP in place is from January 22nd to March 3rd? Well, Your Honor, that was just a letter offering to have an IEP meeting. There was not an IEP in place the entire school year. When was the next IEP actually done? Your Honor, I'm not sure if an IEP was done. Drake stayed in the school. If one was done, it was done for the following school year. It did not affect this particular school year. That is the subject of this litigation. But to be clear, they sent a letter in March offering to do a program and it was not responded to. Is that correct? Your Honor, it might have been responded to eventually. I don't think it was responded to at that time. But Your Honor... The only response may have been the early April complaints given. And Your Honor, that was for the following school year. We were talking about the difficulty of transitioning Drake back to the school during this school year. It would not have nearly been as much of an issue the following school year. Your Honor, I would point out to the Court their letter of August 28th, 2008. Drake was at CLC at this time. They said we can provide a free appropriate publication in the case-restricted environment as required by state and federal regulations in the District Operated Autistic Support Program as required. This is in August. This is after he had been enrolled in CLC and the District is saying we are required to have an IEP in place and offer Drake a FAPE. So their statement saying that they're doing this just as damage control just doesn't ring true, Your Honors. They make the point that Drake's mother was a special ed teacher. That is true. But she's also a special ed teacher who had just lost her house and she had just lost her husband. Your Honor, I would just point out to the Court Judge Sirica's opinion in MC versus Central Regional School Districts. We have cited. This case is extremely on point in saying that you do not leave, you don't leave it to the parents to develop programs, placements, suggestions. These are the jobs of the professionals at the school district. It says here a school district that knows or should know that a child has an inappropriate IEP or is not receiving more than a de minimis educational benefit must correct the situation. Back to the point we were talking about. If the school district tries to renew a dialogue that they were in effect there wasn't a full response to some of their inquiries the previous summer and fall but now on March 4th of 2009 they're trying to renew a dialogue and you're saying they really didn't. You're not sure when the first response was. There may not have been a response anytime soon. What does a school district do in that case? Your Honor, that dialogue had to do very specifically with this program and placement for the following year, school year which is not the subject of this case. What the district is to do is... Well then why not a response immediately back saying look you're talking about the upcoming school year we're willing to meet I'm willing to meet with you over the summer with regard to that but I need you to deal now with the current school year. Didn't happen. Your Honor that ship had sailed. I mean he had been in the program for quite a while he was where he was supposed to be at that time. This is not a situation where because of where he was he was being there was substantive harm happening to him the question was is the district's IEP which specifies that he shouldn't be there but be at the district is that appropriate? If what you're looking for is an IEP in early 2009 that says that he needs to be at CLC and therefore will pay for it doesn't something have to be started by the parents in order to do that because your opposing counsel has said the problem was we didn't have any information in January and February and March of 2009. Your Honor that's simply not true. I mean we've cited portions of the record showing that they had direct knowledge of what happened to D.P. They had knowledge of what happened but and your Honor they're saying why didn't they share what their psychologist said. They have psychologists. That's their entire job is when there are circumstances that happen in a child's education that warrants looking further into the situation but it is their job to propose the evaluation. And all I'm saying is if you want them to do their job, to do their perform their professional responsibility, don't you have to give them the information in order that they can try to do that. Don't you need to try to meet with them? Don't you need to make a request that they actually perform that function? Your Honor the MC case which I've cited says very categorically no. It's not the parent's job. Was there a FAPE in MC? Was there a FAPE in MC? No, Your Honor. There was not. I mean that's the point. The IEP in that case was inappropriate. The district was trying to blame the parents and the court said. But no FAPE was issued in MC. I'm sorry, Your Honor? There was I thought there was a distinction between MC and the facts of this case. I don't think there is, Your Honor. In that case it says if a school district knows that a child has an inappropriate IEP the school board, I mean the school district must correct the situation. That's exactly what we're asking for here. His IEP specifying that he needs to be educated in the district school was inappropriate as of late December 2008 because of what happened to his father and what happened to his house. The IEP under which he entered the school was expiring. The district was going to have no IEP on the table after January 21st, 2009. When you combine those circumstances, especially given that the district had been working with the parents and the parents had been working with the district and sending them information to try to keep things updated I think the district given what happened to Drake's mother had a responsibility to step into this point and propose a reevaluation. At that point Drake's mother could have said no but they didn't even propose it. They were there in September saying let's have an IEP meeting. They were there in November saying have an IEP meeting. They were there in March. Let's have an IEP meeting. The one time they weren't there saying let's have an IEP meeting is when it was most needed. It was the crucial period in this entire case when these tragedies happened and it was up to under MC and the cases that follow it, it was up to the district to take some steps to rectify the situation. You cannot blame Drake's mother who had just lost her husband and her house for not making that request. Otherwise, it's form over substance, Your Honor. Any other questions? Mr. Geary, thank you very much. The case was very well argued by both sides. I think you take the matter under advisement.